IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| FROSTY TREATS, INC., ET AL., | |
|           Plaintiffs, | |
| vs. | Case No. 03-378-CV-W-SOW |
| SONY COMPUTER ENTERTAINMENT AMERICA INC., | |
|           Defendant. | |

**DEFENDANT'S SUGGESTIONS IN SUPPORT OF ITS MOTION TO EXCLUDE
<u>PHILIP JOHNSON'S TESTIMONY & EXPERT REPORT</u>**

**TABLE OF CONTENTS**

I. ISSUE ..................................................................................................................................1

II. BACKGROUND ..................................................................................................................1

III. ARGUMENT.......................................................................................................................2

    A. Plaintiffs' Experts Must Satisfy a *Daubert* Analysis..............................................2

    B. Philip Johnson's Survey Is So Severely Flawed That It Should Be Accorded No Weight Whatsoever and Should Be Excluded ........................................................4

        1. The Survey Was Not Conducted Objectively..............................................5

            a. Mr. Johnson Failed to Use a Proper Control ..................................6

            b. Mr. Johnson's Unjustified Leaps Across a Wide Analytical Gap Reveal a Lack of Objectivity............................................................9

            c. Mr. Johnson's Survey Was Too Far Removed From a Real-World Setting to Be Useful or Reliable .......................................................9

        2. The Survey Questions Were Leading and Suffered from Order Bias .......10

        3. Mr. Johnson Failed to Use Accepted Statistical Principles in Analyzing the Survey Data ..............................................................................................12

    C. Mr. Johnson's Survey Failed to Measure What It Set Out to Measure .................12

    D. Mr. Johnson's Testimony Is Unreliable, Irrelevant, and Untrustworthy...............14

IV. CONCLUSION...................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Raymond Corp.*,
  340 F.3d 520, 523 (8th Cir. 2003) ..................................................................................2

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ............................................................................................1, 2, 3, 4, 15

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ..........................................................................................................1

*Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076, 1082 (8th Cir. 1999) ......................................3, 9

*Joiner*,
  522 U.S. 136 ..........................................................................................................3, 9, 15

*Jordache Enters. V. Hogg Wyld, Ltd.*, 828 F.2d 1482 (10th Cir. 1987) ..........................................10

*Kuhmo Tire Co. v. Carmichael,* 526 U.S. 137 (1999) .........................................................1, 3, 4, 15

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) .......................................................4

*Mark Bric Display Corp. v. Joseph Struhl Co., Inc.*,
  2003 WL 21696318 *9 (D.R.I. Jul. 9, 2003) ................................................................5

*National Bank of Commerce v. Dow Chem. Co.*,
  965 F.Supp. 1490, 1530 (E.D. Ark. 1996) ................................................................3

*Nelson v. American Home Prods. Corp.*,
  92 F.Supp. 2d 954, 967 (W.D. Mo. 2000) ................................................................4

*Paco Sport, Ltd. v. Paco Rabanne Parfums*,
  86 F. Supp.2d 305 (S.D.N.Y. 2000) ................................................................13

*Peitzmeier v. Hennessy Indus., Inc.*, 97 F.3d 293, 296 (8th Cir. 1996) ........................................2

*Prince v. Michelin North America, Inc.*,
  248 F.Supp.2d 900, 902 (W.D. Mo. 2003) ................................................................3, 4

*Reynolds v. Giuliani*,
  118 F.Supp.2d 352, 366 (S.D.N.Y. 2000) ................................................................5

*Schering Corp. v. Pfizer, Inc.*,
  189 F.3d 218, 225 (2d Cir. 1999) ................................................................5

*Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.*,
   559 F.Supp. 1189, 1205 (E.D.N.Y. 1983) ................................................................................5

*Tyco Inds., Inc. v. Lego Systems, Inc.*,
   1987 WL 44363 *9 (D.N.J. Aug. 26, 1999) ..............................................................................5

**Other Authorities**

<u>*Frosty Treats vs. Sony 'Twisted Metal'*</u> *A Study of Likelihood of Confusion*,
   2 (Jun. 27, 2003) ...................................................................................................................1, 2

*McCarthy on Trademarks and Unfair Competition*, vol.32, 250.1
   (4th ed. West 2002).....................................................................................3, 6, 10, 11, 12, 13, 15

*The Manual of Complex Litigation*..................................................................................................5

**Rules**

Rule 104(a) ......................................................................................................................................2

Rule 702 of the Federal Rules of Evidence ....................................................................................3

# DEFENDANT'S SUGGESTIONS IN SUPPORT OF ITS MOTION TO EXCLUDE PHILIP JOHNSON'S TESTIMONY & EXPERT REPORT

## I. ISSUE

Properly conducted consumer-confusion surveys are generally accepted methods of determining issues in trademark cases. When the surveys are unreliable, untrustworthy, and irrelevant, however, they and any related testimony must be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[1] and its progeny.[2] Given that Plaintiffs' so-called likelihood-of-confusion survey in this case is biased, contravenes generally accepted methods of conducting such surveys, and fails to answer the question it poses, all evidence and testimony about the survey should be excluded.

## II. BACKGROUND

Plaintiffs contend that the depiction of an ice-cream truck and associated clown character in SCEA's six *Twisted Metal* video games deceives, confuses, and misleads prospective purchasers of ice-cream products from vans owned by Plaintiffs.[3] To substantiate this claim, Plaintiffs retained Philip Johnson to conduct a consumer-confusion survey and prepare a report, entitled *Frosty Treats vs. Sony 'Twisted Metal' A Study of Likelihood of confusion*.[4]

In Mr. Johnson's survey, interviewers screened potential interviewees by selecting only boys between the ages of 8 and 15 who have a Sony PlayStation at home and who play "the Sony PlayStation video game called Twisted Metal." As soon as the potential subject answered questions establishing his suitability under these criteria, he was taken directly to a "research facility" and shown an 8½" X 11" paper containing the Plaintiffs' stylized use of the words

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993.
[2] *Kuhmo Tire Co. v. Carmichael,* 526 U.S. 137 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997).
[3] 1st Am. Compl. ¶ 55 (May 6, 2003.
[4] Philip Johnson, *Frosty Treats vs. Sony 'Twisted Metal' A Study of Likelihood of Confusion*, 2 (Jun. 27, 2003) (attached as Exhibit 1).

1

"Frosty Treats" and two pictures of one of Plaintiffs' vans (one of the driver's side; one of the passenger's side). On the paper shown to the subject, each of the three images is equal in size and covers approximately one-third of the page.[5] The interviewer then asked a series of recognition questions, probing for detailed answers, including whether the images "remind you in any way of an ice-cream <u>truck</u> or <u>character</u> that you have seen before or are aware of."[6] The first question asked by the interviewer requires the interviewer to show the pictures of Plaintiffs' vans and say, "Here is a picture of an ice-cream truck . . . ."[7]

Mr. Johnson also purports to utilize a control group. There, he followed the same procedures, but instead of showing a three-paneled sheet of paper containing the Plaintiffs' stylized use of the words "Frosty Treats" and their white van, Mr. Johnson used a two-paneled sheet of paper with a school-bus-yellow van emblazoned with a large blue bunny.[8]

Upon completion of the survey, Mr. Johnson prepared and submitted his report. SCEA objects to the survey and related testimony because it is unreliable, irrelevant, and untrustworthy and for failure to follow generally accepted methods for conducting such surveys and hereby requests that the court exclude the survey and Mr. Johnson's report on those bases.

## III. ARGUMENT

### A. Plaintiffs' Experts Must Satisfy a *Daubert* Analysis

This Court has broad discretion in deciding whether to admit or exclude expert testimony.[9] As stated by the Supreme Court, such determination is to be resolved "at the outset, pursuant to [Rule] 104(a).[10] In evaluating admissibility, this Court is bound by Rule 702 of the

---

[5] *See* Exhibit 2.
[6] Johnson *supra* n.4 at 5 (emphasis added).
[7] *See id.* at 4.
[8] *See* Exhibit 3.
[9] *See, e.g.*, *Anderson v. Raymond Corp.*, 340 F.3d 520, 523 (8th Cir. 2003), *citing Peitzmeier v. Hennessy Indus., Inc.*, 97 F.3d 293, 296 (8th Cir. 1996).
[10] *Daubert*, 509 U.S. at 592.

2

Federal Rules of Evidence and the Supreme Court's decision in *Daubert* and its progeny.[11] This Court in the post-*Daubert* era must act as the gatekeeper to ensure that only well-qualified opinions and witnesses that are reliable, relevant, and trustworthy are given the "expert" designation and heard:

> Prior to *Daubert,* courts presented with this situation may have been more inclined to admit the expert testimony and allow the jury, aided by vigorous cross-examination to sort out the relative reliability of opposing expert opinions. But *Daubert* recognized the danger of this approach. By definition, experts testify to matters beyond the common understanding of the jury and as a consequence their opinions carry great weight. Given this, *Daubert* assigned district courts a more vigorous role to play in ferreting out expert opinion not based on scientific method.[12]

In Lanham Act actions and trademark disputes courts traditionally undergo an analysis of consumer surveys where they determine the weight it should be given, particularly in the context of summary judgment motions. In that context, surveys are not generally excluded under this pre-*Daubert* analysis. But in addressing a motion to exclude, as here, there is no doubt that such surveys are now subject to *Daubert* and must be excluded if its proponent fails to satisfy its burden to prove its relevance and reliability.[13]

The gatekeeping function articulated in *Daubert* applies to *all* specialized expert testimony, not just scientific experts.[14] This includes the specialized expert testimony of Mr. Johnson in this case. Thus, *Daubert* requires that, before Mr. Johnson or other experts can express an opinion on *any* issue, the testimony must be shown to be reliable and relevant.[15] To evaluate these factors, the Supreme Court requires that the expert's principles and methodology

---

[11]  *Id.; Kuhmo Tire,* 526 U.S. 137; *Joiner*, 522 U.S. 136*.*
[12]  *National Bank of Commerce v. Dow Chem. Co.,* 965 F.Supp. 1490, 1530 (E.D. Ark. 1996).
[13]  McCarthy et al., *McCarthy on Trademarks and Unfair Competition*, vol.32, 250.1 (4th ed. West 2002)*.*
[14]  *Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076, 1082 (8th Cir. 1999) (citing *Kuhmo Tire,* 526 U.S. 137).
[15]  *Prince v. Michelin North America, Inc.*, 248 F.Supp.2d 900, 902 (W.D. Mo. 2003) (citing *Daubert*, 509 U.S. at 589).

3

1318701v1
Case 4:03-cv-00378-SOW   Document 39   Filed 10/01/03   Page 7 of 20

be closely scrutinized.[16] In addition, as the Eighth Circuit has stated, this analysis must keep in mind that "[t]he proponent of the expert testimony must prove its admissibility by a preponderance of the evidence."[17] Expert opinion testimony that is not shown to be reliable or is not relevant is inadmissible.

> B. **Philip Johnson's Survey Is So Severely Flawed That It Should Be Accorded No Weight Whatsoever and Should Be Excluded**

To determine whether proffered evidence is relevant, the key is whether it will "assist the trier of fact to understand the evidence or to determine a fact in issue."[18] Of course, if a survey is so seriously flawed or does not measure what its proponent intends to measure, as here, such a survey would be worthless to a trier of fact. Even worse, it would likely cause confusion and distraction.

In proving reliability of a consumer survey, the oft-stated factors from *Daubert*, which focus on scientific theory,[19] may seem like an inadequate measure at first blush. But one factor stands out: As with pure scientific testimony, all expert testimony must be based on generally accepted methodology. Indeed, the Supreme Court has sanctioned using as few as one of the *Daubert* factors "when doing so will help determine that testimony's reliability."[20] Here, Mr. Johnson's testimony must be based on methods that are generally accepted for those that administer and analyze consumer surveys.

Courts have recognized *The Manual of Complex Litigation*'s enumeration of the

---

[16] *Nelson v. American Home Prods. Corp.*, 92 F.Supp. 2d 954, 967 (W.D. Mo. 2000) (quoting *Daubert*, 509 U.S. at 595).
[17] *Prince*, 248 F.Supp.2d at 902 (quoting *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001)).
[18] *Daubert*, 509 U.S. at 591.
[19] *Id.* at 593-94 (suggesting factors such as testing, peer review, rate of error, and general acceptance in the relevant community of the scientific theory or method at issue).
[20] *Kuhmo Tire*, 526 U.S. at 141.

4

1318701v1

generally accepted methodology in evaluating proffered survey evidence.[21] Both the Plaintiffs'
and the SCEA's experts regard this work as an authority.[22] This manual lists seven factors to
consider in "assessing the admissibility of a survey":

1. The process was conducted so as to ensure objectivity.

2. The questions asked were clear and not leading.

3. The population was properly chosen and defined.

4. The sample chosen was representative of that population.

5. The data were analyzed in accordance with accepted statistical principles.

6. The data gathered were accurately reported.

7. The survey was conducted by qualified persons following proper interview procedures.[23]

To have an appropriate survey capable of producing acceptable resulting data, a researcher must conform to these simple standards. Mr. Johnson did not employ sound methods in this case, however, and failed to meet these standards. Thus, his results — and consequently his opinions — are unreliable.

### 1. The Survey Was Not Conducted Objectively

To be reliable, a consumer-confusion survey must be objective. To ensure objectivity, a party's purposes in litigation must not infiltrate the sampling process. Thus, a study should be designed to eliminate any bias that could influence and taint the responses and results. Here, Mr. Johnson's survey totally succumbs to this unobjective bias.

---

[21] *See Schering Corp. v. Pfizer, Inc.*,189 F.3d 218, 225 (2d Cir. 1999); *Reynolds v. Giuliani*, 118 F.Supp.2d 352, 366 (S.D.N.Y. 2000); *Tyco Inds., Inc. v. Lego Systems, Inc.*, 1987 WL 44363 *9 (D.N.J. Aug. 26, 1999); *Mark Bric Display Corp. v. Joseph Struhl Co., Inc.*, 2003 WL 21696318 *9 (D.R.I. Jul. 9, 2003);*Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F.Supp. 1189, 1205 (E.D.N.Y. 1983).

[22] Depo. Philip Johnson 59:20 to 60:5 (Aug. 26, 2003) (excerpts attached as Exhibit 4); Depo. Gabriel Gelb 34:19 to 35:3 (Aug. 25, 2003) (excerpts attached as Exhibit 5).

[23] Federal Judicial Center, *Manual for Complex Litigation*, 102 (3d ed. West 2003).

### a. *Mr. Johnson Failed to Use a Proper Control*

Using a control in a consumer survey is a way to eliminate "noise" in the participants' responses.[24] "Noise" can be defined as that which interferes with the purpose of the survey. In the instant case, the crux of the case is whether consumers are likely to be confused by a variety of images contained in six of SCEA's video games and the Plaintiffs' alleged trademarks and trade dress on their vans. Hence, a control was needed in Mr. Johnson's survey to filter out responses where interviewees are "confused" when presented with a generic ice-cream van in order to reach the important question of whether consumers are "confused" by *Plaintiffs' specific* ice-cream van containing the alleged trademarks and trade dress at issue. In other words, the control is supposed to answer the overarching question: Was there confusion because a respondent saw the stylized words "Frosty Treats" and Safety Clown graphic and text on an ice-cream van, or was there confusion because the respondent simply saw a white ice-cream van?

The proper methodology for using a control subject is to make it as similar to the test subject as possible, with the few differences that do exist being limited to the elements being controlled.[25] On this, both parties' experts agree.[26] But Mr. Johnson mistakenly included the color of the van as part of the trade dress that he was controlling for:

> A: The idea was to have a control that captures the essence of the test but doesn't have any of the features that you consider . . . to have secondary meaning or lead to infringement.
>
> Q: And what were those features present in the test vehicle? What were those features?
>
> A: Well, you have a blue bunny instead of the **clown logo** on the door. You don't have the **Frosty Treats logo** and it's sort of a yellow-orange van instead of **white**. So it

---

[24] Depo. Johnson 197:13-14, 198:2-7; Depo. Gelb 97:18-20; McCarthy, *supra* n.14, vol. 32, 259.
[25] Depo. Gelb 96:13-15, 97:4-7; Depo. Johnson 90:10-20.
[26] *See supra* n.26.

6

1318701v1
Case 4:03-cv-00378-SOW   Document 39   Filed 10/01/03   Page 10 of 20

eliminates some of the essential trade dress, as I understand it, of the Frosty Treats company.[27]

In fact, he believed that the trademark and trade dress consisted of "a white van with the Frosty Treat mark with the clown symbol and whatever elements there are to the van."[28] This is where Mr. Johnson's control becomes biased and of no value. A careful review of Plaintiffs' First Amended Complaint reveals absolutely no use of the word "white" — they do not allege the color of the van or the van itself as part of their mark or trade dress.[29] Still, Mr. Johnson considered it part of the "essential trade dress."[30] With such a false basis for the survey, it becomes completely irrelevant.

When confronted with the reality of the case, he attempted to minimize the color-change effect on the survey results in his deposition.[31] But in the end he has no valid rationale for using a yellow-orange van in the control. He claims to have chosen this particular control for two reasons: (1) it was similar and (2) it was found in the same geographical area.[32] Curiously, however, he did not believe this control vehicle was found in the St. Louis area, where half of the survey took place.[33] So geography was obviously not a high priority. Thus, we are left with "similarity" as the reason to choose the yellow van.

The only *similarities* that Mr. Johnson can readily identify, however, are that (1) the vans are similar in size, (2) they have similar door configurations, and (3) they both sell ice cream through the doors:

> Q: So you said that this was a similar vehicle because basically [it's] the same size, it vends ice cream, and it has a similar

---

[27] Depo. Johnson 88:25 to 89:19.
[28] *Id.* at 55:16-25.
[29] *See* 1st Am. Compl.
[30] Depo. Johnson 88:25 to 89:19.
[31] *Id.* at 101:1 to 103:14, 112:14 to 115:8.
[32] *Id.* at 87:3-6.
[33] *Id.* at 88:12-14.

7

1318701v1

configuration of doors. Can you think of anything else in terms of similarities between your test vehicle and your control vehicle?

A: I think that captures the — most of it.[34]

The stark *differences* in the test subject and the control are overwhelming. A side-by-side comparison of the two depictions makes this obvious.[35] And the following chart highlights some of these obvious and ultimately fatal differences:

| Plaintiffs' Van | Control Van |
|---|---|
| White | Yellow |
| Chevrolet | Ford |
| Bell on Top | No Bell |
| Uses Safety Mirrors Behind & In Front | No Mirrors |
| Both Sides Have Windows Running the Full Length of the Van, from Front to Back | Driver Side Has No Windows Except For Driver's Door; Passenger Side Has No Windows Except on Doors. |
| Passenger Side is Fully Covered with Ice-Cream Selections and Other Decoration | Ice-Cream Selections Are Limited to Rear Side Doors; One Decoration Appears on Passenger Door |
| Driver Side Is Decorated from Front to Back | Driver Side Is Completely Blank Except for a Blue Bunny on Driver's Door |
| Driver's Side Has an Extending "Children Crossing — SLOW" Sign | No Sign. |
| Colored Lights or Reflectors Sit Atop the Rear | No Lights or Reflectors on Top of Van |
| "41" Appears on the Front Quarter Panels | "01" Appears on the Driver & Passenger Doors. |

The goal of using a control is to eliminate noise. As aptly stated by Defendants' expert, Gabriel Gelb, "The more variables you have in the control the less you are able to say that

---

[34] *Id.* at 88:15-21.
[35] The Court need only compare Exhibit 2 and Exhibit 3 attached hereto.

8

1318701v1
Case 4:03-cv-00378-SOW   Document 39   Filed 10/01/03   Page 12 of 20

one thing constitutes . . . noise."[36] Mr. Johnson's control had "so many intervening variables that you don't know what . . . you are controlling for . . . ."[37]

A proper control in this case would account for those respondents who may relate a white ice-cream van with one or more specifically identified *Twisted Metal* games — something that is not at issue in this case — and allow the focus to be on the pertinent question of whether respondents related Plaintiffs' specific trademark and trade dress to the game or games. In Plaintiffs' survey, however, Mr. Johnson used a control with so many intervening variables that the survey is rendered worthless.[38]

### b. *Mr. Johnson's Unjustified Leaps Across a Wide Analytical Gap Reveal a Lack of Objectivity*

Mr. Johnson's survey is silent on several key claims raised by the Plaintiffs. Specifically, Mr. Johnson fails to establish any support to show that any of the words or graphics Plaintiffs claim to own are famous, inherently distinctive, or connote secondary meaning. But if their alleged marks or trade dress are not protectible, likelihood of confusion is irrelevant. Still, Mr. Johnson foregoes that analysis and apparently assumes protectibility, without justification. He makes no effort in his study to determine the existence of such attributes. Without such proof, his survey does not even get off the ground as it is based on a false premise. His survey is inherently unreliable. The analytical gap Mr. Johnson attempts to bridge is simply too great.[39]

### c. *Mr. Johnson's Survey Was Too Far Removed From a Real-World Setting to Be Useful or Reliable*

In conducting a proper survey, the test subjects and controls should be placed as

---

[36] Depo. Gelb 97:18-20.
[37] *Id.* at 162:2-4.
[38] *Id.* at 96:22-25.
[39] *See Joiner*, 522 U.S. at 146; *Jaurequi*, 173 F.3d at 1082 n.3.

9

1318701v1

close as possible to the real-world buying situation.[40] Despite reiterating this concept in his deposition,[41] Mr. Johnson failed to follow this accepted technique in at least two ways.

First, Mr. Johnson presents the Plaintiffs' stylized use of the words "Frosty Treats" in an out-of-proportion setting that the consumer would never experience. He admits that isolating the "Frosty Treats" words from the rest of the vehicle should not be done.[42] Nevertheless, he showed the interviewees Exhibit 2, in which he not only isolates the words "Frosty Treats," he shows them greater in size than the van pictured below it. In reality — as can be seen with the aid of a magnifying glass — the "Frosty Treats" sticker on Plaintiffs' actual van is inconspicuously positioned among dozens of stickers of ice-cream products that are sold from the van and takes up a tiny fraction of the area on the van's side.

Second, the typical consumer would not be conceptually spoon-fed the *Twisted Metal* imagery immediately before being subjected to the "Frosty Treats" depiction, as happened here. In real life, consumers' exposure to these separate images are separated by time and space: The video game is played in a house and ice cream would be purchased at a later time, outside, on the street.[43] Mr. Johnson, however, brings these two different activities together in the same artificial realm. By doing so, he completely undermines any value and relevance of the survey.

### 2. The Survey Questions Were Leading and Suffered from Order Bias

Experts using sound survey methodology avoid the use of leading questions and structure the interviews to eliminate order bias.[44] Order bias occurs when an interviewee is set up

---

[40] McCarthy, *supra* n.14, vol. 32, 259.
[41] Depo. Johnson 54:4-11; 199:23 to 200:2.
[42] *Id.* at 200:21-25.
[43] *See Jordache Enters. V. Hogg Wyld, Ltd.*, 828 F.2d 1482 (10th Cir. 1987) (giving survey respondents products side-by-side and asking if they thought the products were produced by the same manufacturer "bears little resemblance to the actual workings of the marketplace.").
[44] McCarthy, *supra* n.14 at vol.32, 282.

10

1318701v1
Case 4:03-cv-00378-SOW   Document 39   Filed 10/01/03   Page 14 of 20

by being asked a question in advance that relates to a later question.[45] In other words, the interviewer places an idea or subject into the mind of the interviewee that is likely to bias the later question. Researchers who do not account for these fatal errors end up with tainted results.

Disregarding generally accepted methodologies,[46] Mr. Johnson impermissibly links two products in a way that completely biases the responses so that his questions are more likely to produce an association in the respondents' minds. He did this by qualifying all interviewees with the question, "Do you ever play a Sony PlayStation video game called Twisted Metal." Then, moments later, the interviewer thrust an image of the words "Frosty Treats" and the Plaintiffs' ice-cream van in front of the interviewer and began asking for associations after saying, "Here is a picture of an ice-cream truck."[47] Having impregnated the test subjects with the knowledge that the survey deals with Sony PlayStation games, the surveyor has exponentially increased the chances of receiving comments that relate to some *Twisted Metal* game.

Moreover, Mr. Johnson reinforced this link by asking if the image depicted on the 8½ X 11 sheet reminded the interviewee "in any way of an ice-cream <u>truck</u> or <u>character</u> . . . ."[48] So after selecting only those children who play some unspecified *Twisted Metal* game and bringing that imagery into the forefront of the respondents' minds, the interviewer asks if he recalls ever seeing or being aware of any ice-cream trucks or characters. This is done even though Mr. Johnson *knows* that it is a convention to refer to video game personae, and specifically Sweet Tooth, as "characters."[49] That is like screening for those that eat at McDonald's and then asking the resulting interviewees if a picture of a cheeseburger reminds them of a restaurant they have patronized. Mr. Johnson signals the respondents that he wants

---

[45] Depo. Johnson 131:17-24; Depo. Gelb 168:16-23.
[46] *See* McCarthy, *supra* n.14 at vol.32, 282-284.1.
[47] Johnson *supra* n.4 at 4.
[48] Johnson, *supra* n.4 at 9.
[49] Depo. Johnson 145:19-21.

11

1318701v1

them to talk about characters or trucks after having just elicited a *Twisted Metal* recollection. His methodology plants seeds with the respondents that grow into the fruit of targeted responses.

### 3. Mr. Johnson Failed to Use Accepted Statistical Principles in Analyzing the Survey Data

In a survey, the surveyor takes a sample of a larger, relevant universe.[50] That sample may be a probability sample or a non-probability sample.[51] A probability sample "involves the mathematically random selection of persons from the defined universe such that each person has a known mathematical probability of being selected for questioning."[52] A non-probability sample, on the other hand, is synonymous with "mall-intercept survey" and does not require such mathematical feats.[53] The data taken from the shopping-mall surveys are not projectable to the larger universe using definite mathematical and statistical probability models.[54] This is the type of survey Mr. Johnson performed.[55]

While a mall-intercept survey may be an acceptable methodology, Mr. Johnson misleadingly implies that he has performed the more thorough probability sampling. He does this by announcing "the statistical error rate for the key measures in this study" and by claiming a sampling tolerance of "$\pm$ 7.8%."[56] Such statements can only be legitimately made, however, in regard to a random probability sample.[57] This is further evidence of Mr. Johnson's bias.

### C. Mr. Johnson's Survey Failed to Measure What It Set Out to Measure

Mr. Johnson's survey purports to measure likelihood of confusion. But his conclusions are based on an erroneous understanding of what likelihood of confusion is.

---

50 McCarthy, *supra* n.14 at vol 32, 262.
51 *Id.*
52 *Id.* at vol.32, 263.
53 *Id.* at vol. 32, 264.
54 *Id.* at vol. 32, 263.
55 Depo. Johnson 59:7-11.
56 Johnson, *supra* n.4 at 5.
57 McCarthy, *supra* n.14 at vol.32, 263.

12

1318701v1
Case 4:03-cv-00378-SOW   Document 39   Filed 10/01/03   Page 16 of 20

> [I]t is clear that there is a ***significant likelihood of confusion*** (18%), such that adolescent and pre-teen boys . . . will mistakenly believe there is a ***relationship or association*** between the Sony game and the real Frosty Treats truck or clown character.[58]

"Likelihood of confusion" does not mean "a relationship or association."[59] Rather, "likelihood of confusion" exists when consumers viewing a mark would probably assume that there exists a sponsorship, affiliation, or connection between the product or service it represents and the source of a different product or service identified by a similar mark.[60]

Here, Plaintiffs must objectively show that SCEA's potential customers[61] believe that Plaintiffs are affiliated with or sponsor some aspect of each of the *Twisted Metal* video games. This was simply not done in Mr. Johnson's survey. He failed to ask the appropriate questions that would expose any likelihood of confusion. For instance, he never asked the subjects any variation of whether they thought Plaintiffs' ice-cream van and the truck in SCEA's video games came from or were sponsored by the same source.

One of the most basic fatal flaws in Mr. Johnson's survey is that it fails to make any measurable distinction between the "Sweet Tooth" or ice-cream truck depictions in any of the *Twisted Metal* games. It is indisputable that depictions of both the "Sweet Tooth" character and the ice-cream truck vary from *Twisted Metal* game to *Twisted Metal* game. Mr. Johnson's survey simply lumps together all "Sweet Tooth" and ice-cream truck related responses without clarifying which specific *Twisted Metal* game the respondents might be mentioning. Plaintiffs would have the Court apply Mr. Johnson's conclusions, to the extent they bear on this matter at all, to an analysis of liability with respect to all the images in each of SCEA's *Twisted Metal* games,

---

[58] Johnson, *supra* n.4 at 16.
[59] McCarthy, *supra* n.14 at vol. 32, 290-91
[60] *Id.* at vol.32, 287.
[61] *See Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp.2d 305 (S.D.N.Y. 2000) (indicating that junior user's potential purchasers are proper universe for forward confusion analysis).

13

1318701v1

without distinguishing the images in one game from the images in another. Because each game is a distinct product and because Plaintiffs must necessarily bring claims against the specific images in each game to recover damages related to that game, Mr. Johnson's likelihood of confusion analysis must be able to identify which images in which game he contends created confusion in the respondents. Mr. Johnson simply cannot make such conclusions because he failed to ask respondents which *Twisted Metal* game imagery they had in mind. For example, Mr. Johnson's survey is completely of no use to assist the trier of fact in answering whether there was an association made between Plaintiffs' vans and the truck in *Twisted Metal: Small Brawl*. Each of those trucks looks completely different: one loosely resembles an armored car, one loosely resembles a jeep and one loosely resembles a panel truck. Mr. Johnson's approach fails to make any such distinction and would not assist the factfinder one bit in determining whether the survey applies or does not apply to any particular game with its respective "Sweet Tooth" or ice-cream-truck embodiment. The survey and report are thus manifestly unfair, prejudicial and of no utility whatsoever to the finder of fact. Mr. Johnson's survey must be rejected.

### D. Mr. Johnson's Testimony Is Unreliable, Irrelevant, and Untrustworthy

The insurmountable flaws that plague Mr. Johnson's survey are highlighted in one of the verbatim responses from his survey. After being asked if he played *Twisted Metal* and handed the "Frosty Treats" depiction, Respondent #130 states:

> First one on top looks like a regular ice-cream truck. The one on the bottom looks similar to the truck in *Twisted Metal*.[62]

What is the significance? Upon examining Exhibit 2 — the sheet the respondent is referencing — it becomes apparent that "the one on the bottom" has no Safety Clown directional, no "Frosty

---

[62] *See* Johnson, *supra* n.4 at "Verbatims" no.130.

14

Treats" logo, and no combined trade dress at issue in this case whatsoever. The side of the truck with the Plaintiffs' purported trademark and trade dress "looks like a regular ice-cream truck."

Nonetheless, Mr. Johnson counts this response as benefiting his clients, the Plaintiffs.[63] Treating such inconclusive responses as definite, unqualified responses in the final survey tabulation is justification alone for marginalizing the survey.[64] In the end, the survey is so flawed and its results so unreliable and untrustworthy, that exclusion is the only recourse.

## IV. CONCLUSION

In Mr. Johnson's own words, "An improperly done survey is simply not useful."[65] Mr. Johnson's survey has so many flaws and shows such gross disregard of generally accepted methods of conducting consumer surveys, it is completely unuseful and should be excluded in totality. Even if consumer-confusion surveys are not generally excluded due to minor flaws, exclusion is required if its proponent fails to meet its burden of showing reliability and relevance.[66] The survey is severely flawed in so many ways, Plaintiffs simply cannot breathe reliability or relevance into it. The survey and all related testimony should be excluded.

Dated: October 1, 2003.

Respectfully submitted,

/s/ Eric A. Buresh
B. Trent Webb, 40778
Rob Adams, 34612
Eric A. Buresh, W.D. Mo. #KS-000369
SHOOK, HARDY & BACON, LLP
1 Kansas City Place
1200 Main Street
Kansas City, Missouri 64105-2118
(816) 474-6550 Telephone
(816) 421-5547 Facsimile
ATTORNEYS FOR SONY COMPUTER
ENTERTAINMENT AMERICA INC.

---

[63] Depo. Johnson 161:1-17.
[64] McCarthy, *supra* n.14, vol.32, 279.
[65] Depo. Johnson 197:17.
[66] *Daubert*, 509 U.S. 579; *Kuhmo Tire,* 526 U.S. 137; *Joiner*, 522 U.S. 136.

15

## CERTIFICATE OF SERVICE

       I HEREBY CERTIFY that on this 1st day of October, 2003, a true and accurate copy of the above and foregoing DEFENDANT'S SUGGESTIONS IN SUPPORT OF ITS MOTION TO EXCLUDE PHILIP JOHNSON'S TESTIMONY & EXPERT REPORT was e-filed with the Court using the CM/ECF system which sent notification to all parties entitled to notice, namely:

R.B. Miller III
Timothy K. McNamara
David R. Barnard
Lathrop & Gage, LC
2345 Grand Blvd., Suite 2800
Kansas City, Missouri 64108-2684
(816) 292-2000 – Telephone
(816) 292-2001 – Facsimile


By /s/ Eric A. Buresh
    ATTORNEY FOR DEFENDANT