IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| FROSTY TREATS, INC., et al. | ) | Case No. 03-378-CV-W-SOW |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SONY COMPUTER | ) | |
| ENTERTAINMENT AMERICA INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO
EXCLUDE PHILIP JOHNSON'S TESTIMONY AND EXPERT REPORT**

LATHROP & GAGE, LC

Timothy K. McNamara
R.B. Miller III
Timothy K. McNamara
David R. Barnard
2345 Grand Blvd., Suite 2800
Kansas City, MO 64108-2684
(816) 292-2000 - Telephone
(816) 292-2001 – Facsimile

ATTORNEYS FOR PLAINTIFFS

# TABLE OF CONTENTS

|   |   | Page |
|---|---|---|
| **I.** | INTRODUCTION | 1 |
| **II.** | ARGUMENT | 2 |
| | **A.** Any Alleged Faults in Survey Evidence Go Towards Weight Rather Than Admissibility | 3 |
| | **B.** The Johnson Survey Utilized Proper Controls | 4 |
| | **C.** The Johnson Survey Did Not Employ Improper Assumptions | 5 |
| | **D.** Johnson Properly Presented the Relevant Imagery to Respondents | 5 |
| | **E.** Johnson Properly and Successfully Screened Survey Participants | 7 |
| | **F.** Johnson Clearly Identified His Survey as a Non-Probability Survey, The Industry Standard for Trademark Litigation Surveys | 8 |
| | **G.** Johnson's Survey Was Properly Constructed to Test The Matters at Issue in This Case | 9 |
| **III.** | CONCLUSION | 10 |

# TABLE OF AUTHORITIES

Page

**Cases**

*Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863 (8th Cir. 1994) .......................................5

*Mut. of Omaha Ins. Co. v. Novak*, 836 F.2d 397 (8th Cir. 1987) ........................................8

*National Football League Properties, Inc. v. New Jersey Giants, Inc.*,
   229 U.S.P.Q. 785 (D.N.J. 1986) ......................................................................................8

*Prudential Ins. Co. v. Gibraltar Fin. Corp.*, 217 U.S.P.Q. 1097 (9th Cir. 1982)................3

*SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980) ..................................................3

*Swisher Mower & Machine Co., Inc. v. Haban Mfg., Inc.*, 931 F.Supp. 654
   (W.D. Mo. 1996) ..............................................................................................................5

*Tyco Industries, Inc. v. Lego Systems, Inc.*, 5 U.S.P.Q.2d 1023 (D.N.J. 1988)...................8

*Woodsmith Publ'g Co. v. Meredith Corp.* 904 F.2d 1244 (8th Cir. 1990).........................5


**Treatises**

*Manual for Complex Litigation*, §21.493 at 103 (3d ed. West 2003).................................3

*McCarthy on Trademarks and Unfair Competition*, §32:170 at 32-274 to
   32-275 (West Group 4th ed. 2002) .............................................................2, 4, 8, 9, 10

*Non-Probability Sampling Designs for Litigation Surveys*, 81 Trademark Rep.
   169 (1991)..........................................................................................................................8

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| FROSTY TREATS, INC., et al. ) | Case No. 03-378-CV-W-SOW |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| SONY COMPUTER ) | |
| ENTERTAINMENT AMERICA INC., ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFFS' AMENDED OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE PHILIP JOHNSON'S TESTIMONY AND EXPERT REPORT

Plaintiffs submit this Amended Opposition to Defendant's Motion to Exclude Philip Johnson's Testimony and Expert Report ("Amended Opposition") in lieu of its Opposition to Defendant's Motion to Exclude Philip Johnson's Testimony and Expert Report ("Original Opposition") originally filed on October 27, 2003. Plaintiffs' Amended Opposition differs from the Original Opposition only in that it includes three exhibits mistakenly omitted from the Original Opposition. These exhibits are attached hereto as Exhibits B, D and F. The Amended Opposition is otherwise identical to the Original Opposition, save for relettering of all exhibits to reflect the added exhibits.

### I. INTRODUCTION

Plaintiffs' allege that Defendant's *Twisted Metal* video game series is likely to cause confusion and to deceive consumers and the public regarding the source, affiliation and sponsorship of the parties' respective products, dilutes and tarnishes the distinctive quality of Plaintiffs' marks and trade dress, and defames and disparages Plaintiffs' business. Plaintiffs' First Amended Complaint, ¶ 2 (May 6, 2003). In support of their trademark claims, Plaintiffs have engaged Phillip Johnson to conduct a survey of

likelihood of confusion. Mr. Johnson has 32 years of experience conducting such surveys. *See* Declaration of Philip Johnson, ¶ 2. Mr. Johnson is recognized as an authority in the field of consumer confusion surveys, having lectured before the American Bar Association, the Practicing Law Institute, and the International Trademark Association on the use of survey research in litigation. *Id*. The survey conducted by Mr. Johnson in this matter is consistent with other surveys conducted by Mr. Johnson and admitted as expert evidence in numerous cases over the past 32 years.

The methods employed by Mr. Johnson in screening potential interviewees for his survey are consistent with both industry standards as well as his 32 years of experience. Defendant has filed a Motion to Exclude Philip Johnson's Testimony and Expert Report and Suggestions in Support thereof ("Suggestions in Support"). Defendant's Suggestions in Support mischaracterizes a number of aspects of Johnson's survey in an attempt to discredit the survey. Despite Defendant's contentions, Johnson's survey was properly and carefully constructed and is well within the bounds of industry standards. The survey set out to determine whether a likelihood of confusion existed between Plaintiffs' marks and Defendant's video game series. Through proper and objective methods, the Johnson survey determined that such confusion does in fact exist and at high levels. Johnson's survey comports with the industry standards in the field of likelihood of confusion surveys and as such should be admitted as evidence in this matter.

**II.     ARGUMENT**

### A. Any Alleged Faults in Survey Evidence Go Towards Weight Rather Than Admissibility

A challenge to the admissibility of survey evidence must be considered under far different parameters than standard *Daubert* challenges. By far the majority rule in trademark litigation remains that the existence of flaws in the design or implementation of a survey does not impact the admissibility of the survey. Such issues only impact the weight given to such survey evidence. 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, §32:170 at 32-274 to 32-275 (West Group 4th ed. 2002)("Technical unreliability goes to the weight accorded a survey, not its admissibility."); Federal Judicial Center, *Manual for Complex Litigation*, §21.493 at 103 (3d ed. West 2003)("Even if the court finds deficiencies in the proponent's showing [relating to an expert survey], the court may receive the evidence subject to argument going to its weight and probative value."); *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980)("In evaluating survey evidence, technical deficiencies go to the weight to be accorded to them, rather than to their admissibility"); *Prudential Ins. Co. v. Gibraltar Fin. Corp.*, 694 F.2d 1150, 1156, 217 U.S.P.Q. 1097, 1100 (9th Cir. 1982)("Technical unreliability goes to the weight accorded a survey, not its admissibility.").

Even if Defendant's alleged technical deficiencies in Johnson's survey were true, which they aren't, they would not warrant exclusion. Defendant seeks a remedy contrary to the overwhelming trend in trademark litigation without any authority to support their position. Defendant alleges that Johnson failed to utilize proper controls in his survey. As discussed below, however, the control was entirely proper. Moreover, Defendant fails to cite to a single case in which a court ruled that an improper control is justification to

3

exclude a survey.  In light of Defendant's failure to present any authority to contradict the Eighth Circuit and national position that critiques of survey evidence only impact only the survey's weight, not its admissibility, this Court should deny Defendant's Motion to Exclude.

### B. The Johnson Survey Utilized Proper Controls

Here, Johnson utilized a proper control, one that conforms with industry standards.  Defendant alleges that Johnson's use of a yellow ice cream truck in his control somehow negatively impacts the accuracy of the survey.  To the contrary, Johnson's decision to use a yellow van underscores the fact that he successfully crafted a detailed survey to accurately test the matters at issue in this case.  As discussed in detail below, Frosty Treat's biggest competitors use yellow vans.  Johnson therefore utilized a yellow van in his control in order to ensure the control reflected real world conditions as closely as possible.  Defendant's own survey expert, Gabriel Gelb, acknowledged that a control should be made "as close as possible to the [real world] buying situation." *See* Deposition of Gabriel Gelb 98:21 – 99:12 (August 25, 2003) attached as Exhibit A; *see also McCarthy* at 32:163 ("[T]he closer the survey context comes to marketplace conditions, the greater the evidentiary weight it has.").

Johnson's survey successfully approximated market conditions by utilizing a yellow truck as its control.  Frosty Treat's largest competitor in the Kansas City market, where part of the survey took place, is Kansas City Ice Cream. *See* Deposition of David Carslake 24:23 – 25:8 (August 15, 2003), attached hereto as Exhibit B and incorporated herein by reference.  This company uses yellow trucks with a Blue Bunny® logo.  Mr. Johnson used a picture of one of the Kansas City Ice Cream trucks as a control in order to duplicate real world conditions.  (A picture of a Kansas City Ice Cream truck is attached

hereto as Exhibit C and incorporated herein by reference.) Furthermore, Frosty Treat's largest national competitor, Summersong, also utilizes a mostly yellow truck with a Blue Bunny® logo. *See* Deposition of Carl Long 49:19 – 49:22 (August 14, 2003), attached hereto as Exhibit D and incorporated herein by reference. (A picture of a Summersong ice cream truck is attached hereto as Exhibit E and incorporated herein by reference.) By utilizing a yellow truck with a Blue Bunny® logo for his control, Johnson's survey reflected market conditions as closely as possible. Johnson's choice of control strengthens the viability of his survey.

### C. The Johnson Survey Did Not Employ Improper Assumptions

Sony attacks the fact that Phil Johnson was asked to assume the evidence would prove certain facts were true in coming up with his opinions. The assumptions made by Johnson in his survey are consistent with standard assumptions made by nearly all expert witnesses.[1] Defendant's attacks make no sense. Virtually every expert is asked to assume certain facts that will be proven through other evidence.

### D. Johnson Properly Presented the Relevant Imagery to Respondents

Johnson adhered to the proper methods for presenting the information to survey respondents. As Johnson indicated in his deposition, "the presentation [should be] done….as people encounter it in the world ***as best you can***." *See* Deposition of Philip Johnson Deposition 54:7-11 (August 26, 2003), attached hereto as Exhibit F and incproprated herein by reference. Defendant's criticism centers on what they allege to be an "out-of-proportion" presentation of the marks. In the survey, Respondents are shown

---

[1] The cases cited by Defendant to support their "improper assumptions" contention are inapposite. In *Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076, 1082 n.3 (8th Cir. 1999), the court was criticizing the scientific validity of the method employed by the expert. The "gap" the court was referencing was the jump the expert made between the evidence gathered through his untested methods and the opinion he then proferred based on that evidence. And in *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), the court recognized that "[t]rained experts commonly extrapolate from existing data."

5

a picture of the Frosty Treats logo as well as a separate picture of a Frosty Treats van. Defendant claims that the fact that the two pictures are of identical size is somehow confusing to the respondent. Defendant is alleging that the survey respondents will mistakenly believe that the Frosty Treats sign is the same size as the Frosty Treats van.[2] This argument does not give much credit to survey respondent's intelligence and defies common sense. Further, the logical extrapolation of Defendant's position is that, to properly implement the survey, Johnson would have had to have had a van driven in to the survey room for the respondent to be able to accurately appreciate the setting in which the various marks were presented. This is absurd. Johnson's survey relied on the ability of the respondent to discern that the logo is not the same size as the van. It is safe to assume that such reliance is reasonable.

Defendant's criticism of the sequence of questioning by Johnson also demonstrates a fundamental unfamiliarity with the nature of likelihood of confusion surveys. Defendant alleges that because the respondents would not normally be presented with each of the conflicting images in such a short period of time, Johnson's survey is irrelevant. Sony neglects to mention that Phil Johnson never showed respondent's Sony's game. He merely asked, in a blinded screening question, if they were familiar with it. The respondents had only their own memories and impressions of Sony's game when shown Frosty Treat's marks, just as they would if they saw an actual Frosty Treat's truck on the street. The goal of the expert is to craft a survey that approximates real world conditions as best as possible. That is what Johnson has done. By properly structuring the screening questions so that the respondent is unaware that

---

[2] Interestingly, Defendant's own survey expert, Gabriel Gelb, failed to show even a single picture of any of Plaintiffs' marks to any of his respondents. Yet, Mr. Gelb reaches numerous "conclusions" regarding the likelihood of confusion between the marks.

6
CC 1201479v4
Case 4:03-cv-00378-SOW   Document 48   Filed 10/28/03   Page 9 of 15

*Twisted Metal* is the focus of the survey, Johnson has properly approximated real world conditions as best as possible.

### E. Johnson Properly and Successfully Screened Survey Participants

Defendant's contentions regarding order bias are meritless. Their description of the qualifying questions asked of respondents is misleading and their description of the ensuing questioning is inaccurate. Defendant implies that all respondents were asked a qualifying question regarding their familiarity with *Twisted Metal* such that respondents could not help but realize that the survey was focusing in some way on *Twisted Metal*. In fact, they were asked about four other Sony games as well to "blind" them to the purpose of the survey. Defendant's selective identification of the screening questions posed to potential respondents distorts the nature of Johnson's selective process. Potential respondents were provided no indication that the single question regarding *Twisted Metal* was any more or less important than the rest of the screening questions.

Furthermore, Defendant's colorful description of the interview process is inaccurate. Once a respondent indicated a familiarity with *Twisted Metal*, an interview did not "thrust an image of the words 'Frosty Treats'" upon that respondent "moments later" such that the respondent would become "impregnated" with the knowledge that the survey was attempting to link *Twisted Metal* and Frosty Treats. Sony cites no evidence that supports this melodrama. To the contrary, the question regarding familiarity with *Twisted Metal* was buried deep within a number of other screening questions. Those respondents who successfully answered the screening questions were then escorted to an entirely different room where they were asked a series of questions which eventually lead to the presentation of the Frosty Treats marks and the posing of related questions.

7

### F. Johnson Clearly Identified His Survey as a Non-Probability Survey, The Industry Standard for Trademark Litigation Surveys

In conducting a non-probability survey, Johnson conformed with the industry standard in likelihood of confusion surveys. Defendant's attempt to discredit the value of Johnson's survey contradicts the overwhelming trend in trademark litigation surveys. Studies have shown "that about 97 percent of in-person commercial surveys are non-probability samples." *See McCarthy* at 32:165, quoting Jacoby & Handlin, *Non-Probability Sampling Designs for Litigation Surveys*, 81 Trademark Rep. 169 (1991). In fact, "[n]on-probability sampling is now the most commonly performed type of in-person survey done for trademark and unfair competition litigation." *See McCarthy* at 32:165. As such, non-probability surveys are virtually universally recognized as reliable evidence. *Tyco Industries, Inc. v. Lego Systems, Inc.*, 1987 WL 44363, 5 U.S.P.Q.2d 1023 (D. N.J. 1988)("[C]ourts have repeatedly accepted mall intercept surveys in litigation…"); *National Football League Properties, Inc. v. New Jersey Giants, Inc.*, 637 F.Supp. 507, 518, 229 U.S.P.Q. 785, 792 (D. N.J. 1986)("[A] non-probability survey…is sufficiently reliable to be admitted into evidence and accorded substantial weight."); *Mutual. of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 400-01 (8th Cir. 1987)(non-probability survey supports finding of likelihood of confusion). The fact that Johnson's survey was a non-probability survey should have no effect on its evidentiary weight.

Furthermore, Johnson made no attempt to disguise the fact that his survey was a non-probability survey. In the opening paragraph of the "Methodology" section of Johnson's report, he clearly identifies the survey as a mall-intercept survey. *See* Johnson Report at ¶ 5. Anyone with the knowledge to understand the difference between a

probability survey and a non-probability survey would be fully aware that Johnson's survey represented the latter and evaluate the weight of the evidence accordingly.

### G. Johnson's Survey Was Properly Constructed to Test The Matters at Issue in This Case

Johnson's survey accurately assessed whether there was a likelihood of confusion between the products in question. Defendant alleges that Johnson's survey merely tests for "association" rather than likelihood of confusion. In an effort to support this assertion, Defendant cites *McCarthy* as condemning the methodology used by Johnson. In fact, viewed in its entirety, the section of *McCarthy* cited by Defendants states that questions asking for word association, "***without further probing***...may well be meaningless and irrelevant." *McCarthy* at 32:176 (emphasis added). Review of the questions asked in Johnson's survey show that it conformed precisely with the requirements of *McCarthy*.

After asking the respondents to comment freely on what the ice cream truck caused them to think of, examiners were instructed to ask respondents who were familiar with the truck the following question:

> <u>Question 2b</u>: *Tell me what you know about it.* **PROBE:** *What else do you know about it?* **PROBE FOR COMPLETE RECALL.**

Johnson Report at ¶ 9 (emphasis in original). If respondents later said that the picture reminded them of an ice cream truck or character, they were asked the following questions:

> <u>Question 3b:</u> *What ice cream truck or character is that? Tell me about it in your own words.* **PROBE FOR COMPLETE RECALL.**
>
> <u>Question 3c:</u> *What makes you say that?* **PROBE:** *Anything else?*

9

CC 1201479v4
Case 4:03-cv-00378-SOW   Document 48   Filed 10/28/03   Page 12 of 15

*See* Johnson Report at ¶ 9 (emphasis in original). Johnson's interviewees were instructed in bold, capital, italics words to be sure to "probe" the respondents for further information regarding their responses and did so. As such, Johnson's survey appears to satisfy *McCarthy's* calling for "further probing" to validate survey responses

Defendant also criticizes Johnson for failing to ask respondents "whether they thought Plaintiffs' ice-cream van and the truck in SCEA's video games came from or were sponsored by the same source." *See* Suggestions in Support, p. 13. Ironically, just a few pages earlier in their brief, Defendant argued that Johnson's report was biased because it did not sufficiently separate its presentation of Plaintiffs' ice cream truck and the qualification questions for SCEA's video game, instead bringing "these two different activities together in the same artificial realm." *See* Suggestions in Support, p. 10. Defendant's contradictory arguments that Johnson brought the two concepts too closely together and also failed to bring the two concepts together closely enough demonstrate that Johnson's survey strikes the proper balance in qualifying the respondents without leading them.

Defendant's critique regarding differentiation between variations of *Twisted Metal* is equally irrelevant. The object of Johnson's survey was to determine whether respondents think that Frosty Treats sponsors or is affiliated with the *Twisted Metal* series. None of the respondents mentioned any distinctions between the games. This is unsurprising because Sony sells the game as a unified franchise with a consistent clown character. Johnson did not set out to distinguish between the various versions of *Twisted Metal*, nor should he have.

### III. CONCLUSION

Defendant's criticisms of Johnson's report are unpersuasive. The overwhelming majority of courts have held that technical criticisms of trademark surveys impact only the weight given, not admissibility. Further, the alleged deficiencies in Johnson's report are unfounded. Johnson's report meets or exceeds the industry standard in every way, reflecting the knowledge Johnson has developed in 32 years of constructing surveys for trademark litigations. Accordingly, Defendant's motion should be denied.

Respectfully Submitted,

LATHROP & GAGE, LC

/s/ Timothy K. McNamara
R.B. Miller III
Timothy K. McNamara
David R. Barnard
2345 Grand Blvd., Suite 2800
Kansas City, MO 64108-2684
(816) 292-2000 - Telephone
(816) 292-2001 – Facsimile

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served electronically this 28th day of October, 2003, on the following:

B. Trent Webb
Rob Adams
Eric A. Buresh
Shook, Hardy & Bacon, LLP
One Kansas City Place
1200 Main Street
Kansas City, MO 64105-2118

/s/Timothy K. McNamara
Attorney for Plaintiffs